UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
E. LEE,                                                  :

                Plaintiff,              :          07 Civ. 10628 (DF)

                               :          **MEMORANDUM AND**
      -against-                                       **ORDER**
                               :
HERITAGE HEALTH & HOUSING, INC.,                         :

                Defendant.              :
------------------------------------------------------------X

**DEBRA FREEMAN, United States Magistrate Judge:**

       In this case, which is before me on consent pursuant to 28 U.S.C. § 636(c),

Plaintiff E. Lee ("Plaintiff")[1] claims that her employer, defendant Heritage Health and Housing

("Defendant") violated her rights under the Family and Medical Leave Act of 1993 (the

"FMLA" or the "Act"), 29 U.S.C. § 2601 *et seq.*, and the New York City Human Rights Law

(the "NYCHRL"), N.Y. Admin. Code § 8-101 *et seq.*, by terminating her after she took a leave

of absence due to work-related stress.  (*See generally* Complaint, dated Nov. 27, 2007

("Compl.") (Dkt. 1).)  Defendant has moved for summary judgment (Dkt. 17), seeking dismissal

of Plaintiff's FMLA claims on the grounds that (1) she did not have a "serious health condition"

within the meaning of the statute, and (2) if she did, she did not provide Defendant with adequate

notice of that condition (*see* Defendant's Memorandum of Law in Support of Summary

Judgment, dated Oct. 1, 2008 ("Def. Mem.") (Dkt. 19), at 8-14.  Defendant similarly seeks

summary judgment on Plaintiff's NYCHRL claim on the ground that Plaintiff did not have a

disability covered by that law (*id*. at 15), although Defendant also argues that, if the Court were

---

      [1] In her submissions to the Court, Plaintiff identifies herself as "Irwisa Lee."  (*See, e.g.,*
Affidavit of Irwisa Lee in Opposition to Motion for Summary Judgment, sworn to Oct. 10, 2008
("Lee Aff.") (Dkt. 22).)

to dismiss Plaintiff's federal claims, then it should decline to exercise jurisdiction over any pendent claim (*id.* at 14-15).

For the reasons discussed below, Defendant's motion for summary judgment is granted as to Plaintiff's FMLA claim, and Plaintiff's NYCHRL claim is dismissed on jurisdictional grounds, without prejudice to the assertion of that claim in state court.

## BACKGROUND

### A.    Factual Background[2]

Defendant is a not-for-profit corporation that "provides enriched housing, counseling, education, employment and support to individuals in the community who have special needs, including the mentally disabled, substance abusers, persons living with HIV/AIDS, recently released ex-offenders, and the homeless, as well as overall community development." (*See* Defendant's Local Rule 56.1 Statement of Undisputed Material Facts, dated Sept. 28, 2008 ("Def. 56.1 Stmt.") (attached to the Declaration of Elissa Hutner in Support of Defendant's Motion for Summary Judgment, dated Sept. 29, 2008 ("Hutner Decl.") (Dkt. 20)), at ¶ 3 (citing Affidavit of Serge Joachim, sworn to Sept. 23, 2008 ("Joachim Aff.") (attached to the Hutner Decl., as Ex. B)), at ¶ 2; Plaintiff's Statement Pursuant to Local Rule 56, dated Oct. 22, 2008 ("Pl. 56.1 Stmt.") (Dkt. 25), at ¶ 2.)

Plaintiff was employed by Defendant for approximately 12 years, until March of 2007. (Lee Aff., at ¶ 1.)  Defendant hired Plaintiff as a residence counselor in March 1995 and

---

[2] The undisputed facts summarized herein are taken from the parties' respective statements pursuant to Local Civil Rule 56.1 (which have been duly supported with citations to the record), as well as the affidavits, deposition testimony, and other evidence that the parties have submitted.  To the extent the parties' Rule 56.1 statements or the evidence reveals disputed issues, the Court has laid out both parties' versions of the underlying facts.

promoted her in 2002 to the position of unit supervisor of a program known as Supported

Housing.  (*See* Transcript of the Deposition of Irwisa Lee, conducted Aug. 20, 2008 ("Lee

Dep.") (attached to Hutner Decl., at Ex. A), at 6-7, 10.)  Plaintiff's immediate supervisor was

Serge Joachim ("Joachim"), Director of Defendant's Community Residential Programs. (Def.

56.1 Stmt., at ¶ 4 (citing Lee Dep., at 12; Joachim Aff., at ¶ 1); Pl. 56.1 Stmt., at ¶ 4.)  By 2006,

as unit supervisor, Plaintiff was responsible for 100 beds (*i.e.,* 100 residents), in apartments

scattered throughout the Bronx and Manhattan.  (Def. 56.1 Stmt., at ¶ 5 (citing Lee Dep., at 7,

11; Joachim Aff., at ¶¶ 10-11); Pl. 56.1 Stmt., at ¶ 5.)  Plaintiff was also responsible for

supervising three residence counselors (*see* Lee Dep., at 7; Joachim Aff., at ¶ 5), and for meeting

with them regularly to review their cases, the services they were performing, and the accuracy

and timeliness of their progress notes (*see* Joachim Aff., at ¶ 6; Lee Dep., at 23-27).  For each

resident for whom the staff provided services, the staff prepared a Restorative Services Plan

("RSP")[3] to document those services, and Plaintiff then submitted the RSPs to her supervisor,

Joachim.  (*See* Lee Dep., at 14.)  Plaintiff was also responsible for submitting, to Joachim,

weekly reports that provided information as to whether any paperwork or documentation was

incomplete.  (*See* Def. 56.1 Stmt., at ¶¶ 7-8 (citing Lee Dep., at 17-18, 21, 25); Pl. 56.1 Stmt., at

¶¶ 7-8.)

---

[3] A Restorative Service Plan is an annual assessment that lists mental health or other
services provided to a client.  (*See* Joachim Aff., at ¶ 5; *id.* at Ex. 1 (Sample Restorative Services
Plan).)  According to Lee, the RSP is updated with any change to a client's services, such as a
change in medication.  (*See* Lee Dep., at 18-19, 24-25.)

1.      **Events Prior To March 2007**

In March 2006, the New York State Office of Mental Health awarded Defendant an additional 24 beds.  (Def. 56.1 Stmt., at ¶ 6 (citing Lee Dep., at 11-12; 44-45; 48; Joachim Aff., at ¶ 11; *id*. at Ex. 2 (Defendant Weekly Report, dated 11/06 ("Weekly Report"))).)  According to Defendant, it had originally planned to assign these additional beds to Plaintiff, but she refused to accept the beds on the grounds that she was stressed and had too much work.  (*See id.*; *see also* Joachim Aff., at ¶ 10.)  At her deposition, Plaintiff confirmed that Defendant had wanted to assign the additional beds to her (Lee Dep., at 43-45), but she testified that Defendant did not plan to increase her pay for taking on the additional work (*see id*. at 45 ("There was a lot of stress going on there because they wanted me to take over more beds for the same money.")).  According to Plaintiff, she did not refuse the assignment of the additional 24 beds, but instead told Joachim that she "would take on the additional beds for an increase in salary."  (Lee Aff., at ¶ 10; *see* Pl. 56.1 Stmt., at ¶ 6.)  In opposition to Defendant's motion, Plaintiff further asserts that "at no time did [she] say [she] was 'stressed' or had too much work."  (Lee Aff., at ¶ 10.)

In any event, Defendant eventually made the decision not to assign Plaintiff the additional beds, but rather to split Supported Housing evenly into two units, each with its own supervisor.  (Def. 56.1 Stmt., at ¶ 6 (citing Lee Dep., at 11-12, 44-45, 48; Joachim Aff., at ¶ 11; Weekly Report).)  Plaintiff retained 62 beds (rather than the 100 for which she had previously had responsibility), and her unit became known as "Supported Housing 1."  (*Id*.) A new unit supervisor was appointed for the remaining 62 beds, in a second unit called "Supported Housing 2."  (*Id*.)

2.     **Facts Relating to Plaintiff's Initial
       <u>Request for Sick Leave, in March 2007</u>**

Around February of 2007, Plaintiff began to have problems with a residence counselor

under her supervision, Joanne Rivers ("Rivers"), who, according to Plaintiff, had reportedly been

abusing clients.  (Lee Dep., at 28-30.)  On or about February 27, 2007,[4] Plaintiff and Rivers

apparently "got into a shouting match" that was so loud that it disrupted a meeting being held by

Defendant's Executive Director, Jorge Abreu ("Abreu").[5]  (Joachim Aff., at ¶ 26; *see id.* at Ex. 6

(Memorandum to File, dated Mar. 20, 2007 ("3/20/07 File Mem."), at 1.)  At the time of the

incident, Joachim was away from the office on vacation, so Plaintiff met with his assistant Joan

Douglas ("Douglas") to discuss the altercation with Rivers.  (*See* Lee Dep., at 29-30, 33.)  She

also discussed the incident in a supervisors' meeting at which James Woods ("Woods"),

Defendant's Chief Operating Officer, was present.  (*Id.* at 29, 37-39; *see* Joachim Aff., at ¶ 26;

3/20/07 File Mem., at 1.)  Woods placed Rivers on a temporary administrative suspension, until

Joachim's return.  (Joachim Aff., at ¶ 27; 3/20/07 File Mem., at 1.)

Upon Joachim's return on March 1, 2007, Douglas briefed him regarding Plaintiff and

Rivers's altercation.  (Joachim Aff., at ¶ 28; *see* 3/20/07 File Mem., at 1.)  While Joachim was

conferring with Douglas, Plaintiff arrived at Joachim's office to speak with him.  (*See id.*)

Joachim advised Plaintiff that he was in a meeting and that he would "get back to her" once the

meeting was over.  (Joachim Aff., at ¶ 28.)

Plaintiff then went to Abreu's office.  (Def. 56.1 Stmt., at ¶ 10 (citing Lee Dep., at 38,

40; Joachim Aff., at ¶ 12).)  Plaintiff spoke with Abreu to tell him about her problem with Rivers

---

[4] Joachim's affidavit apparently refers to the date in error, as February 27, 2008.

[5] The transcript of Lee's deposition refers to Abreu as "Abril."

(Lee Dep., at 37; 39), and also to tell him that she "was feeling stressed about what was going on" and needed a week off from work (Def. 56.1 Stmt., at ¶¶ 10-11 (citing Lee Dep., at 38, 40; Joachim Aff., at ¶ 12); Pl. 56.1 Stmt, at ¶¶ 10-11).  According to Plaintiff, she told Abreu that she was stressed due to "a combination of things."  (Def. 56.1 Stmt., at ¶¶ 12-13 (citing Lee Dep., at 41-42); Pl. Stmt., at ¶¶ 12-13.)[6]  Abreu told Plaintiff to take a week off and to bring back a doctor's note.  (Def. 56.1 Stmt., at ¶ 14 (citing Lee Dep., at 42-43); Pl. 56.1 Stmt., at ¶ 14.)[7]

Following her meeting with Abreu, Plaintiff submitted a "Leave Time Utilization" ("LTU") form, indicating that she would be requesting sick leave.  (Joachim Aff., at ¶ 12; id. at Ex. 3.[8])  Plaintiff also submitted a memorandum to Defendant's Fiscal Department, stating that she would be "going out on sick leave as of 3/2/07," that she would be "using her sick time,"and that she would "submit documentation from her doctor."  (Joachim Aff., Ex. 4 (Memorandum to Fiscal Department from Irwisa Lee, dated Mar. 1, 2007); Lee Dep., at 36.)  As of March 1, when she requested this leave, Plaintiff had not made a doctor's appointment (her doctor saw patients

---

[6] Although, at her deposition, Plaintiff could not recall any specific incidents (other than her difficulties with Rivers) that were contributing to her stress (see Lee Dep., at 41-42), she did testify generally that "[t]here w[ere] a lot of things going on . . . [Joachim] was coming to my office every minute saying 'Jorge said to fill the beds.  We are losing money.'  [Joachim] had me going here, there and everywhere . . . Do this.  Do that.  Jumping here and there and doing a million things."  (Lee Dep., at 49.)  Plaintiff also testified that, on one occasion, Joachim had insisted that she come into work to train an employee, even though she was feeling sick.  (See id. at 50-51.)  Plaintiff testified that Joachim's various requests had caused her to be "stressed out," and that "[i]t was too much at one time."  (Id. at 51.)

[7] Plaintiff also eventually met with Joachim to complain that she was stressed and having difficulty with Rivers.  (Joachim Aff., at ¶ 30.)  Joachim similarly told Plaintiff that, if she were stressed, she could take time off from work.  (Id.)

[8] Joachim identifies the document attached to his affidavit as Exhibit 3 as the March 1, 2007 LTU form submitted by Plaintiff.  This exhibit, however, is not legible.

on a "walk-in" basis), but she confirmed at her deposition that it had already been decided that she would take a week off from work.  (Lee Dep., at 43.)

According to Defendant, Plaintiff did not expressly request leave pursuant to Defendant's Family Leave Policy,[9] (Def. 56.1 Stmt., at ¶ 38 (citing Joachim Aff., at ¶¶ 15, 22; *id.* at Ex. 8 (Defendant's Family Leave Policy ("Def. Leave Policy")))), or the Family and Medical Leave Act (Joachim Aff., at ¶ 14), and she did not advise Defendant that she suffered from a serious medical condition (Def. 56.1 Stmt., at ¶ 39 (citing Lee Dep., at 40; Joachim Aff., at ¶ 14)). Plaintiff disputes this, claiming that she requested and was granted a "medical" leave, and that she complied with Defendant's request to provide a doctor's note.  (*See* Pl. 56.1 Stmt., at ¶ 38; Lee Aff., at ¶¶ 2-6.)  Plaintiff states that Defendant accepted the note and did not request further documentation.  (Lee Aff., at ¶ 5.)  Plaintiff further states that, during her leave, she was unable to work and that she saw two doctors, one of whom increased her prescription blood pressure medication.  (*Id.* at ¶¶ 3, 6.)

During her period of sick leave, Plaintiff saw Dr. Ruben U. Carvajal, whom she described at her deposition as "[her] medical doctor."  (Lee Dep., at 56.)  Dr. Carvajal provided Plaintiff with the note that she submitted to Defendant.  (Def. 56.1 Stmt., at ¶ 17; Pl. 56.1 Stmt., at ¶ 17; *see* Joachim Aff., Ex. 5 (Note from Dr. Carvajal, dated Mar. 3, 2007).)  The note stated that Plaintiff was suffering from "acute stress secondary to job-related issues since 3/1/07" and

---

[9] Defendant's Personnel Procedures Manual governs requests for leave.  (Def. 56.1 Stmt., at ¶ 37 (citing Joachim Aff., at ¶ 22; Def. Leave Policy).)  According to the manual, when an employee is ill, "sick leave must be taken first.  Once the employee's sick leave has been exhausted, s/he must use all vacation leave time available."  (Def. Leave Policy, at 1)  The manual also states that Defendant requires medical certification to support a claim for leave for an employee's own serious health condition and that upon return, "the employee will be restored to his/her original, or equivalent, position."  (*Id*. at 2.)

advised that Plaintiff "rest." (*Id.*)  The note further stated that Plaintiff would be able to return to work on March 12, 2007. (*See id.*; *see also* Lee Dep., at 56.)

Plaintiff testified that, when she visited Dr. Carvajal, she also complained of abdominal pain, and that, as a result, he referred her to her gynecologist, Dr. Chang, whom she then saw on March 5, 2007. (Lee Dep., at 57.)  At least for purposes of the pending motion, however, Lee does not appear to argue that she was suffering from any type of abdominal or gynecological ailment during the period of her leave, and she admits that she did not provide Defendant with any note or other documentation from Dr. Chang. (*See* Def. 56.1 Stmt., at ¶ 20 (citing Joachim Aff., at ¶ 13); Pl. 56.1 Stmt., at ¶ 20; *see also* Lee Dep., at 58.)

Plaintiff also states that, prior to March 2007, she had a history of hypertension, which was known to Defendant, and that, during the period of her sick leave, one of the two doctors she saw (she does not state which one) increased her blood pressure medication. (Def. 56.1 Stmt., at ¶ 18 (citing Lee Dep., at 51-52); Pl. 56.1 Stmt., at ¶ 18; *see* Lee Aff., at ¶ 6.)  The record, however, contains no documentation of this change in medication; no evidence of any increased dosage amount; no evidence of the actual or expected duration of any change in any pre-existing prescription; and no evidence that any change in Plaintiff's medication was necessitated by the stress for which she took leave.  Plaintiff does not claim to have been prescribed any psychiatric medications for her episode of stress, and the record also contains no evidence that Dr. Carvajal treated Plaintiff for stress by doing anything more than see her on the single occasion that Plaintiff reports. (Def. 56.1 Stmt., at ¶ 19 (citing Lee Dep., at 51-52); Pl. 56.1 Stmt., at ¶ 19; *see also* Lee Dep., at 57-58 (Plaintiff could not recall whether she scheduled a follow-up appointment with Dr. Carvajal).)  Plaintiff concedes that, apart from the increase in her blood

pressure medication, she was not prescribed any other treatment, by any health care provider, during her leave.  (Def. 56.1 Stmt., at ¶ 19 (citing Lee Dep., at 51-52); Pl. 56.1 Stmt., at ¶ 19.)

**3.    Defendant's Review of Plaintiff's Work and the Decision**
**To Remove Her from Her Position as Unit Supervisor**

On March 1, 2007, the same date that Plaintiff had requested sick leave, Joachim met with Rivers to discuss her altercation with Plaintiff.  (Joachim Aff., at ¶ 31.)  When Rivers met with Joachim, she complained about a lack of supervision by Plaintiff.  (*Id.* at ¶ 32.)  Specifically, Rivers told Joachim that a number of RSPs were outdated and that Plaintiff had not provided Rivers with assistance on how to update them.  (*Id.*)  As a result of Rivers' complaint, and while Plaintiff was out of the office on sick leave, Joachim reviewed several of Supported Housing 1's RSPs, and discovered that the plans were outdated and incomplete.  (*Id*. at ¶¶ 33-35; Def. 56.1 Stmt., at ¶ 25 (citing Joachim Aff., at ¶ 34).)  According to Joachim, his review contradicted Plaintiff's weekly reports, which had stated that there were no incomplete RSPs, progress notes or other documentation (Joachim Aff., at ¶ 33); further, Joachim asserts that Plaintiff knew or should have known that her reports were incorrect and misleading (Joachim Aff., at ¶ 34; Def. 56.1 Stmt., at ¶ 26 (citing Joachim Aff., at ¶ 35)).[10]  Thus, Joachim attests that, to his belief, Plaintiff had intentionally falsified her reports.  (Def. 56.1 Stmt, at ¶ 27 (citing Joachim Aff., at ¶¶ 35, 38).)  Joachim further states that, in light of the incomplete records, as well as "Plaintiff's inability to supervise her staff[,] and her inappropriate, disruptive behavior," he came to believe that Plaintiff could no longer serve as unit supervisor of Supported

---

[10] Defendant's Rule 56.1 Statement ¶ 35 also cites to Exhibits 9 and 10 to the Joachim Affidavit.  It appears, however, that these exhibits were not filed with the Court.

Housing 1.  (Def. 56.1 Stmt., at ¶ 28 (citing Joachim Aff., at ¶¶ 25-32); *see also* Joachim Aff., at ¶ 36.)

Plaintiff disputes Joachim's assertions regarding her purported misconduct, and avers that, in the course of her employment, "[she] never falsified any records or failed to keep records properly up to date."  (Lee Aff., at ¶ 11; Pl. 56.1 Stmt., at ¶ 25.)  Plaintiff also asserts that she had discovered some records that were outdated due to the neglect of other workers, and that Defendant was aware of this problem and was also aware of her work to correct them.  (Lee Aff., at ¶ 11.)

### 4.    Plaintiff's Return To Work on March 12, 2007, and Her Second Leave of Absence

When Plaintiff returned to work on March 12, 2007, she purportedly felt much better, was no longer stressed, and was ready to work.  (Def. 56.1 Stmt., at ¶ 16 (citing Lee Dep., at 51-53); Pl. 56.1 Stmt., at ¶ 16.)  On the same date, however, Joachim met with Plaintiff to tell her that she would no longer be the supervisor of Supported Housing 1.  (Def. 56.1 Stmt., at ¶ 21 (citing Lee Dep., at 59-60; Joachim Aff., at ¶ 37); Pl. 56.1 Stmt., at ¶ 21.)  Plaintiff also met with both Joachim and Woods, together, regarding this decision. (*See* Def. 56.1 Stmt., at ¶ 23 (citing Lee Dep., at 60-61); Pl. 56.1 Stmt., at ¶ 23; *see also* Lee Dep., at 63.)  They informed her that, rather than remain in current position as supervisor of 62 beds, she could become the supervisor of a 26-bed unit, with the beds located mostly in Queens.  (Lee Dep., at 59-60; Joachim Aff., at ¶ 37.)  Plaintiff asserts that she asked if she could have additional staff to work with her, if she were to accept such a position, as it had been indicated to her that one of the Queens apartments had been taken over by drug dealers and that she would therefore be required to retrieve the apartment from the drug dealers.  (*See* Lee Dep., at 60-61.)  Joachim and Woods informed

10

Plaintiff that she would not be given any additional staff for the position.  (*See id*. at 61.)  When

Plaintiff continued to ask for staff, Joachim again said "no" (*id.*), and, at that point, according to

Plaintiff, Woods turned around and said, "You're going to do it or resign" (*id*.).

Defendant portrays the events of March 12 somewhat differently.  According to

Defendant, when Plaintiff returned from leave on that date, Joachim told her that he had

reviewed the documentation for her unit and found it to be outdated, which, at the time, Plaintiff

did not dispute.  (Joachim Aff., at ¶ 37.)  Joachim then offered Plaintiff two options – either to

take the smaller 26-bed unit in Queens as supervisor, with no decrease in pay or title, or to be

demoted to a "Case Worker" position in Manhattan, at a lower salary.  (*Id*.)  Joachim states that

he warned Plaintiff that, if she did not take either of the positions, she would be fired for

falsifying weekly reports.  (*Id*.)  Instead of responding, Plaintiff went to see Woods, who

requested that Joachim join them.  (*Id*. at ¶ 41.)

The parties do not dispute that, after the meeting with Woods, Joachim told Plaintiff to

take another week off.  (Def. 56.1 Stmt., at ¶ 30 (citing Lee Dep., at 61; Joachim Aff., at ¶ 41);

Pl. 56.1 Stmt., at ¶ 30; *see* Lee Dep., at p. 52; Joachim Aff., at ¶¶ 16, 17, 42 (stating that, since

he was not going to return Plaintiff to her position as Supervisor of Supported Housing 1, and, as

Plaintiff had "plenty of leave time" available, he "told her to go home and think about things")․)

Plaintiff testified that she did not wish to take additional time off from work (Lee Dep., at 62),

but she nonetheless completed a second LTU form, so that she would be paid for additional

leave (*id*. at 53).  She also submitted a memorandum to Defendant's Fiscal Department which

stated the following:

> As per my meeting with Mr. Joachim and Mr. Woods today they
> have indicated that they would give me time off (if stressed).  I am

hereby using my sick time so that I can be paid.  Thank you for
your kind conside[ration].

(Joachim Aff., Ex. 7 (Memorandum to Karen Fogle, Fiscal Department, from Irwisa Lee, dated

Mar.12, 2007 ("3/12/07 Lee Mem."); Def. 56.1 Stmt., at ¶ 31; Pl. 56.1 Stmt., at ¶ 31.)  Plaintiff

testified that Joachim told her that, if she did submit the memorandum, she would not be paid

(*see* Lee Dep. at 61-62), and that Joachim also instructed her to write the words "if stressed" on

her memorandum (*id.*).  In fact, according to Plaintiff, Joachim himself wrote those words on her

memorandum, and then circled and initialed the phrase.  (*See id.*)  Defendant did not require

Plaintiff to submit a medical note for the week of March 12-19, 2007, nor did she submit one.

(Def. 56.1 Stmt., at ¶ 33 (citing Joachim Aff., at ¶ 17); Pl. 56.1 Stmt., at ¶ 33.)

### 5.  Plaintiff's Termination

Plaintiff returned to work a second time, on March 19, 2007, ready to resume work (Def.

56.1 Stmt., at ¶¶ 32, 34 (citing Lee Dep., at 68; Joachim Aff., at ¶ 19); Pl. 56.1 Stmt., at ¶¶ 32,

34), but, when she then refused to agree to one of the job options that Joachim had offered her on

March 12, her employment was terminated (Def. 56.1 Stmt., at ¶ 36 (citing Joachim Aff., at

¶ 47); Pl. Stmt., at ¶ 36; *see also* Lee Dep., at 8; Joachim Aff., at ¶ 46).

The parties do not significantly dispute the events of March 19, but Plaintiff describes a

meeting with Joachim on that date, in which he presented her with three memoranda.  (Def. 56.1

Stmt., at ¶ 35 (citing Lee Dep., at 64-65; Joachim Aff., at ¶ 46); Pl. 56.1 Stmt., at ¶ 35.)  The first

memorandum stated that Plaintiff would take the position in Queens (*id.*); the second

memorandum stated that Plaintiff would be demoted and assume a position in the "mixed

program" in the Bronx (*id.*), earning $30,000 per year (*see* Lee Dep., at 65); and the third

memorandum stated that Plaintiff would be terminated for falsification of records (Def. 56.1

Stmt., at ¶ 35 (citing Lee Dep., at 64-65; Joachim Aff., at ¶ 46); Pl. 56.1 Stmt. at ¶ 35).  Plaintiff

states that, when she did not accept any of the memoranda, Joachim "threw" the third of these

memoranda at her, and she left.  (Lee Dep., at 67-68.)

### 6.      Plaintiff's Claim for Unemployment Insurance Benefits

Following her termination, Plaintiff filed a claim for temporary unemployment insurance

with the New York State Department of Labor.  (*See* Certification of David Abrams, Esq., in

Opposition to Motion for Summary Judgment, dated Oct. 23, 2008 ("Abrams Cert.") (Dkt. 23),

at ¶ 2.)  At a hearing held on October 22, 2007, Defendant contended that it had fired Plaintiff

because, during her leave of absence, her immediate supervisor had discovered that Plaintiff had

falsified numerous reports.  (*See id*. at Exs. A-B (excerpts of transcript of a hearing before the

New York State Unemployment Insurance Appeal Board, conducted Oct. 22, 2007); Ex. C (State

of New York Unemployment Insurance Appeal Board Decision and Notice of Decision *In the

Matter of Irwisa H. Lee,* A.L.J. Case No.007-21752, dated Nov. 13, 2007), at 2.)

In ruling on Plaintiff's benefits claim, an administrative law judge ("ALJ") noted that

Defendant did not show Plaintiff the records that she had allegedly falsified, and that

Defendant's attorney had sent Plaintiff a letter, stating that she was being offered the position of

Case Manager because Defendant believed that, due to stress, Plaintiff was unable to continue

working as a Unit Supervisor of Supported Housing 1.  (*Id*. at Ex. C, at 3.)  In upholding

Plaintiff's eligibility to receive unemployment benefits, the ALJ found the testimony of

Defendant's witness (Woods) to be unworthy of belief and accepted Plaintiff's testimony that

she was told she was fired because she would not accept a demotion with a $17,000 cut in her

annual salary.  (*Id*.)

C.    **Procedural History**

Plaintiff commenced this action on November 27, 2007, claiming that her leave was protected by the FMLA and that Defendant violated her rights under the FMLA by refusing to reinstate her to her former position, and/or that Defendant retaliated against her for exercising or intending to exercise her FMLA rights.  (Compl., at ¶¶ 12-16.)  Plaintiff also claims that Defendant violated the NYCHRL, by failing to reasonably accommodate her temporary disability.  (*Id*. at ¶¶ 17-19.)

On October 2, 2008, Defendant moved for summary judgment dismissing all of Plaintiff's claims.  (*See* Notice of Motion, filed Oct. 2, 2008 (Dkt. 17); *see also* Def. Mem., at 2.)  Defendant argues that Plaintiff's stress was not a serious health condition within the meaning of the FMLA and that she failed to give sufficient notice that her leave was taken pursuant to the Act.  (*Id.* at 8-14.)  Defendant additionally argues that Plaintiff did not suffer from a disability within the meaning of the NYCHRL and that, even if she did, she was permitted to take leave and was therefore adequately accommodated.  (*Id.* at 14-15.)  Alternatively, Defendant argues that, if Plaintiff's FMLA claims are dismissed, the Court should decline to exert pendent jurisdiction over her NYCHRL claim.  (*Id.*; 28 U.S.C. § 1367(c).)

On October 23, 2008, Plaintiff filed an opposition to Defendant's motion, arguing that the condition from which she was suffering in 2007 qualified as "serious" under the FMLA and relevant regulations (*see* Plaintiff's Brief in Opposition to Motion for Summary Judgment, dated Oct. 23, 2008 ("Pl. Mem.") (Dkt. 21), at 3), and that she gave adequate notice of her need for FMLA leave (*id.* at 3-5).  Plaintiff also contends that, because her stress qualified as a temporary disability, Defendant violated her rights under the NYCHRL by failing to accommodate her and that, under that statute, she should have been allowed to return to her position at the end of her

14

leave.  (*Id.* at 6.)  Defendant filed a reply on October 31, 2008, responding to Plaintiff's various

arguments.  (*See generally* Defendant's Reply Memorandum of Law, dated Nov. 14, 2008 ("Def.

Reply Mem.") (Dkt. 27).)

## DISCUSSION

## I.   SUMMARY JUDGMENT STANDARD

### A.   Rule 56

Under Rule 56(c), a motion for summary judgment may be granted when the parties'

sworn submissions show that "there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir.

1996).  The moving party bears the burden of showing that no genuine issue of material fact

exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Accordingly, the Court must

"view the evidence in the light most favorable to the party against whom summary judgment is

sought and must draw all reasonable inferences in his favor."  *L.B. Foster Co. v. Am. Piles, Inc.*,

138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574 (1986)).

Nonetheless, the party opposing summary judgment "may not rely merely on allegations

or denials in its own pleading," but " must . . . set out specific facts showing a genuine issue for

trial."  Fed. R. Civ. P. 56(e)(2).  This means that "[t]he non-moving party may not rely on

conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d

Cir. 1998) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)), but, rather,

must present "significant probative evidence tending to support the complaint."  *Smith v.*

*Menifee*, 00 Civ. 2521 (DC),  2002 U.S. Dist. LEXIS 4943, at *9 (S.D.N.Y. Mar. 25, 2002)

(citing *First Nat'l Bank of Ariz. v. Cities Servs. Co.,* 391 U.S. 253, 290 (1968). "If the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

In sum, the Court "cannot try issues of fact; it can only determine whether there are

issues to be tried." *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.,*

388 F.2d 272, 279 (2d Cir. 1967); *accord Sutera v. Schering Corp.*, 73 F.3d 13, 15-16

(2d Cir. 1995).  Where there is no genuine issue of material fact, viewing the evidence in the

light most favorable to the nonmoving party, summary judgment is appropriate.  *See Liberty*

*Lobby*, 477 U.S. at 248.

### B.    Local Civil Rule 56.1

Under this Court's rules, a party moving for summary judgment under Rule 56 must

submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as

to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).

If the opposing party fails to respond to the moving party's Rule 56.1 Statement, then the

material facts contained in the moving party's statement are deemed admitted as a matter of law.

*See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment

motions by freeing district courts from the need to hunt through voluminous records without

guidance from the parties."  *Holtz v. Rockefeller &Co.,* 258 F.3d 62, 74 (2d Cir. 2001).  Local

Rule 56.1, however, with which both parties here have complied, does not relieve the party

seeking summary judgment of the burden of establishing that it is entitled to judgment as a

matter of law.  *Id.*  Summary judgment may only be granted where the Court is satisfied that the

undisputed facts, as supported by the record, "'show that the [movant] is entitled to a judgment

as a matter of law.'"  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (quoting Fed. R. Civ. P. 56(c)).

## II.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.   Plaintiff's FMLA Claims

#### 1.   The Statutory Framework

The FMLA provides an eligible employee with the right to take up to 12 weeks of leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D). The Act defines "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(A)-(B).

An eligible employee who takes leave from work pursuant to the FMLA because of a serious health condition is entitled, upon return from such leave, "to be restored by the employer to the position of employment held by the employee when the leave commenced; or to be restored to a position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1)(A)-(B).  It is unlawful for an employer to interfere with, restrain, or deny an eligible employee the rights provided for in the Act.  29 U.S.C. § 2615(a)(1).

"To make out a *prima facie* case on a claim for interference with FMLA rights under 29 U.S.C. § 2615(a)(1), a plaintiff must establish five elements:  "(1) that she is an eligible employee under the FMLA; (2) that defendant is an employer as defined in [the] FMLA; (3) that she was entitled to leave under [the] FMLA; (4) that she gave notice to the defendant of her

intention to take leave; and (5) that she was denied benefits to which she was entitled under [the] FMLA." *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004) (citing *Santos v. Knitgoods Workers' Union, Local 155*, No. 99 Civ. 1499 (BSJ), 1999 U.S. Dist. LEXIS 9036, at*7 (S.D.N.Y. June 15, 1999), *aff'd,* 252 F.3d 175 (2d Cir. 2001); *Garraway v. Solomon R. Guggenheim Found.*, 415 F. Supp. 2d 377, 382 (S.D.N.Y. 2006).

Unlike a claim of interference with FMLA rights, a claim of retaliation for exercising those rights is analyzed under burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Potenza v. City of New York*, 365 F.3d 165, 167-68 (2d Cir. 2004); *Geromanos,* 322 F. Supp. 2d at 433. To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) she exercised rights protected under the FMLA, (2) she was qualified for the position, (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Potenza*, 365 F.3d at 168; *accord Reilly v. Revlon Inc.*, 620 F. Supp. 2d 524, 537-38 (S.D.N.Y. 2009); *Geromanos*, 322 F. Supp. 2d at 433-34. Once a plaintiff establishes a *prima facie* case, "a presumption of retaliation is created and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination." *Di Giovanna v. Beth Israel Med. Ctr.*, No. 08 Civ. 02750 (LAK), 2009 U.S. Dist. LEXIS 80990, at *22 (S.D.N.Y. Sept. 8, 2009). If the employer does so, the presumption of discrimination is rebutted, *id.*, and "[t]he burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason," *id.* (quoting *Forde v. Beth Israel Med. Ctr.*, 546 F. Supp. 2d 142, 150 (S.D.N.Y. 2008)). To satisfy this burden, the plaintiff may rely on evidence presented to establish the *prima facie* case, as well as additional evidence, which may include direct or

18

circumstantial evidence of discrimination.  *Id.* at *22-23 (citing *Muhleisen v. Wear Me Apparel LLC*, 07 Civ. 8738, 2009 U.S. Dist. LEXIS 68338, at *17 (S.D.N.Y. July 30, 2009)).

## 2.   **The Applicable Regulations**

The FMLA expressly gives the United States Department of Labor (the "DOL") authority to "prescribe such regulations as are necessary" to carry out the Act.  29 U.S.C. § 2654. "Regulations promulgated pursuant to such express delegation of authority 'are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'"  *Miller v. AT&T Corp.*, 250 F.3d 820, 833 (4th Cir. 2001) (quoting *Chevron U.S.A. Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).  Courts use a two step approach outlined in *Chevron* to determine whether an agency regulation is entitled to such deference.  First, a court must determine whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.  If it has, the court must adhere to the intent of Congress.  *Id.* at 843. "If the statute is silent or ambiguous with respect to the specific issue," the court must consider whether the agency's interpretation "is based on a permissible construction of the statute."  *Id.*

In this case, while Congress has not directly spoken to the question of when an employee's health condition should be deemed sufficiently serious to qualify for FMLA protection, the parties do not dispute that the DOL regulations that set out a test making such a determination are entitled to *Chevron* deference, and, indeed, these regulations appear consistent with the intent of Congress.  *See Miller*, 250 F.3d at 835 (4th Cir. 2001) (finding DOL regulations not "manifestly inconsistent with Congress' intent"); *see also Thorson v. Gemini*, 205 F.3d 370, 380 (8th Cir. 1998) ("The DOL's objective test for "serious health condition," which avoids the need for employers – and ultimately courts – to make subjective decisions about statutory 'serious health conditions,' is clearly a permissible construction of the statute.").

Of particular relevance here are the DOL regulations that speak to the question of what types of illness or impairment will constitute "a serious health condition involving continuing treatment by a health care provider," under the FMLA.  The regulations provide that such a condition will include:

> a period of incapacity[11] of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
>> (1)  Treatment *two or more times*, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider;
>>
>> or
>>
>> (2) Treatment by a health care provider *on at least one occasion*, which results in *a regimen of continuing treatment* under the supervision of the health care provider.

29 C.F.R. § 825.115(a)(1)-(2) (2009)[12] (emphasis added); *see Barnett*, 67 F. Supp. 2d. at 384; *Basso v. Potter*, 596 F. Supp. 2d 324, 337 n.5 (D. Conn. 2009).

Under the regulations, "treatment includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition."  29 C.F.R. § 825.113(c).  A "regimen of continuing treatment" may include, "for example, a course of prescription medication (*e.g.,* an antibiotic) or therapy requiring special equipment to resolve or

---

[11] For purposes of the regulations, "incapacity" means "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom."  29 C.F.R. § 825.113(b).

[12] The Court notes that the relevant sections of the Code of Federal Regulations have been renumbered since the time of the alleged events, but remain substantively unaltered.

alleviate the health condition."  *Id.*  However, a "regimen of continuing treatment" that includes

"the taking of over-the counter medications . . . or bed-rest, drinking fluids, exercise, and other

similar activities that can be initiated without a visit to a health care provider, is not, by itself,

sufficient to constitute a regimen of continuing treatment for the purposes of FMLA leave."  *Id*.

The regulations state that mental illness may be considered a serious health condition, but "only

if all conditions of this section are met."  29 C.F.R. § 825.113(d).

### 3. Sufficiency of Plaintiff's Evidence of a "Serious Health Condition"

For purposes of its summary judgment motion, Defendant does not dispute that Plaintiff

was an "eligible employee" under the FMLA or that Defendant is an "employer" within the

meaning of the Act.  (Def. 56.1 Stmt., at ¶¶ 1-2; Pl. 56.1 Stmt., at ¶¶ 1-2.)  Defendant does argue,

though, that it should be granted summary judgment on Plaintiff's FMLA claims because

Plaintiff cannot show that either of her absences constituted protected leave under the Act.

Specifically, Defendant argues that Plaintiff has not come forward with evidence capable of

showing (1) that she had a serious health condition entitling her to take leave under the FMLA,

or (2) that she provided adequate notice of her intention to take such leave.  (*See* Def. Mem.,

7-14.)  As to the first of these points, the Court agrees that, in opposition to Defendant's motion,

Plaintiff has not come forward with evidence of a "serious health condition" capable of

satisfying her *prima facie* burden.  Accordingly, the Court need not reach Defendant's "notice"

argument in order to award summary judgment in its favor.

Plaintiff asserts that the serious health condition for which she was entitled to FMLA

leave was "acute stress," and, as set out above, she did produce to Defendant a doctor's note

stating that diagnosis.  Plaintiff does not contend, however, that she received "inpatient care in a

hospital" for her stress condition, *see* 29 U.S.C. § 2611(11)(A), and thus, to fall within the

statute, she must be able to demonstrate that she received "continuing treatment by a health care provider" for that condition, *see* 29 U.S.C. § 2611(11)(B); *see also Tambash v. St. Bonaventure Univ.*, No. 99 Civ 967, 2004 U.S. Dist. LEXIS 19914, at * 23 (W.D.N.Y. Sept. 24, 2004) (where plaintiff did not allege that he received inpatient care, "the question at issue [was] whether the plaintiff had an illness or mental condition that required 'continuing treatment by a health care provider'") (quoting statute); *Barnett v. Revere Smelting & Ref. Corp.*, 67 F. Supp. 2d. 378, 384 (S.D.N.Y. 1999) (where plaintiff had never received inpatient care for his claimed medical condition, his condition could only fall under subsection B of 29 U.S.C. § 2611(11)).

Plaintiff argues that she can demonstrate that her stress could be found by a jury to be a serious health condition, for which she received continuing treatment, both because she was incapacitated for more than three days and because she visited two physicians, one of whom increased her blood pressure medication.  (*See* Pl. Mem., at 3; Def. 56.1 Stmt., at ¶ 18 (citing Lee Dep., at 51-52); Pl. 56.1 Stmt., at ¶ 18.)  Based on the applicable test set out in the DOL regulations, however, Plaintiff's evidence of "continuing treatment" is insufficient.

### a.    Plaintiff Has Not Produced Evidence That She Was Treated Two or More Times, as Required by 29 C.F.R. § 825.115(a)(1).

While, by way of Dr. Carvajal's note, Plaintiff has introduced evidence suggesting that she was indeed "incapacitated" for more than three consecutive days, *see* 29 C.F.R. § 825.115(a),[13] she has *not* shown that she was "treated" two or more times by a health care provider within 30 days of the first day of her incapacity, as required by sub-section (1) of that

---

[13] Plaintiff actually refers to 29 C.F.R. § 825.114 (Pl. Mem. at 3), but, under the regulation's new numbering scheme, that prior section corresponds to what is now Section 825.115.

provision.  On this point, Plaintiff offers Dr. Carvajal's note to demonstrate that she was seen by

him for her stress, and her own testimony that she also visited her gynecologist, Dr. Chang.

Viewing the evidence in the light most favorable to Plaintiff, and drawing all inferences

in her favor, the Court accepts that Plaintiff may be capable of showing at trial that Dr. Carvajal

"treated" her for her stress condition, by conducting an examination sufficient to enable him to

render a diagnosis.  *See Miller*, 250 F.3d at 830-31 (finding plaintiff's visit to her doctor during

which the doctor conducted a physical examination and drew blood constituted treatment under

the DOL regulations).

Plaintiff, however, has not proffered any evidence capable of showing that Dr. Chang

also treated her for the same condition.  Plaintiff does not offer any testimony or documentary

evidence, of any kind, to show that Dr. Chang even examined her, much less that he examined or

treated her for the same stress condition for which Plaintiff was purportedly entitled to FMLA

leave.  At most, Plaintiff suggests that one of the two doctors she saw – and she cannot say

which – prescribed an increased dose of a blood pressure medication that she had already been

taking.  Plaintiff does not provide any evidence in admissible form that Dr. Chang – the

gynecologist – was treating her for hypertension, or, indeed, that he was treating her in any way,

for any condition.  Plaintiff's vague statement that "one of her doctors" increased her blood

pressure medication is simply insufficient to raise a triable issue of fact as to whether she was

treated "two or more times" by a health care provider, for her serious health condition.  *See*

29 C.F.R. § 825.115(a)(1).

**b.      Plaintiff Has Also Not Produced Evidence of a Regimen of
Continuing Treatment, To Satisfy 29 C.F.R. § 825.115(a)(2).**

Alternatively, Plaintiff invokes Section 825.115(a)(2) of the DOL regulations, arguing that she was seen at least once, by one health care provider, who then supervised a "regimen of continuing treatment" for her stress condition.  (*See* Pl. Mem. at 3.)  As the record is entirely vague as to what treatment, if any, was afforded to Plaintiff by Dr. Chang, the Court turns back to Plaintiff's proffered treatment by Dr. Carvajal, to consider whether a jury could find that his purported treatment of Plaintiff was sufficient to constitute a regimen of continuing treatment.

Standing alone, Plaintiff's single reported visit to Dr. Carvajal, coupled with his prescription of "rest," cannot qualify as the required "regimen" of care, as bed-rest is a treatment that can be initiated without a visit to a health care provider.  *See* 29 C.F.R. § 825.113(c).  Plaintiff has not produced any evidence that she had follow-up visits with Dr. Carvajal for treatment of her stress.  (*See* Lee Dep., at 57-58 (testifying that she could not recall whether she scheduled such a follow-up); *see also Basso v. Potter*, 596 F. Supp. 2d 324, 342 (D. Conn. 2009) (finding that the severity of the plaintiff's claimed health condition was unclear, where, *inter alia,* nothing in the record indicated follow-up treatment).)  Also, as with Dr. Chang, Plaintiff has not been able to attribute her purported change in blood pressure medication to Dr. Carvajal.  Certainly, Plaintiff has not offered evidence suggesting that any medication change was intended as "a continuing regimen" of treatment for stress, under Dr. Carvajal's supervision, or that it was even intended as a treatment for her stress, as opposed to an adjustment to her existing treatment for managed hypertension.  *See also Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 500 (7th Cir. 1999) (affirming grant of summary judgment, where record contained no evidence, such as a physician's affidavit, describing the necessity of physical therapy sessions).

24

Essentially, on the evidentiary record presented by Plaintiff, the Court is left with nothing more definite than evidence that Dr. Carvajal, on one occasion, diagnosed Plaintiff with acute stress, instructed her to rest, and projected that she would be able to return to work after a period of rest. This is not enough to qualify Plaintiff's stress condition as "serious," within the meaning of the FMLA. *Cf. Tambash*, 2004 U.S. Dist. LEXIS 19914, at *26 (denying summary judgment, where, although defendant argued that plaintiff did not have a sufficiently serious health condition, record indicated that, for a period of months, plaintiff was under continuing treatment by a clinical psychologist and psychiatrist for conditions including major depression, and that his treatment involved both psychiatric medications and psychotherapy); *Kamtaprassad v. Chase Manhattan Corp.*, No. 00 Civ. 8834 (DLC), 2001 U.S. Dist. LEXIS 21532, at*17 (S.D.N.Y. Jan. 3, 2002) (denying summary judgment where plaintiff offered evidence of depression that resulted in a five-month leave of absence, with accompanying letters from her doctors); *Price v. City of Fort Wayne*, 117 F.3d 1022,1024-25 (7th Cir. 1997) (denying summary judgment where physician's affidavit not only stated that plaintiff "'was on the edge of a physical and mental break-down,'" but where plaintiff produced evidence of repeated visits to her doctor for many medical procedures over a two-month period).

Accordingly, while "acute stress" may, under certain circumstances, constitute a "serious health condition" for FMLA purposes, *see Tambash,* 2004 U.S. Dist. LEXIS 19914, at *26 (noting that "stress, depression and/or nervous breakdown" can constitute a serious health condition), Plaintiff here has failed to produce evidence capable of establishing that the stress from which she allegedly suffered was a health condition for which she received "continuing treatment." Thus, Plaintiff has not raised a triable issue of fact as to whether she was entitled to

leave under the FMLA – a fact she must be able to demonstrate to make out a *prima facie* case of interference with her FMLA rights.

As Plaintiff's FMLA claims fail for this reason, the Court need not decide the other question raised by Defendant, *i.e.* whether Plaintiff provided sufficient notice of her intention to take FMLA leave.  In the absence of evidence sufficient to demonstrate that Plaintiff had a serious health condition, Defendant's motion for summary judgment on Plaintiff's FMLA claims is granted.[14]

### B.     Plaintiff's NYCRHL Claim

Plaintiff also claims that Defendant failed to accommodate her "disability" under the NYCHRL.  *See* N.Y. Admin. Code § 8-101 *et seq*.  Under the NYCHRL, it is unlawful for an employer to discriminate against an employee because of such person's actual or perceived disability.  N.Y. Admin. Code § 8-107(a).  A disability is defined as "any physical, medical, mental or psychological impairment, or a history or record of such impairment."  N.Y. Admin. Code § 8-102.16(a).  A "physical, mental or psychological impairment," may include the

---

[14] Plaintiff's retaliation claim is subject to dismissal for the same reason as her underlying claim that Defendant interfered with her rights under the FMLA.  As set out above, in order to make out a *prima facie* case of retaliation, Plaintiff must show that she exercised "rights protected by the FMLA."  (*See supra* at 18-19.)  If Plaintiff cannot show that she had a serious health condition, entitling her to FMLA leave, then, *a fortiori,* she cannot show that she was retaliated against for exercising rights that were, in fact, protected by the Act.  *See Brown v. Pension Bds*, 488 F. Supp. 2d 395, 410 (S.D.N.Y. 2007) (granting summary judgment on retaliation claim where, because plaintiff failed to establish the fourth and fifth elements of a *prima facie* case of interference (inadequate notice and denial of FMLA benefits), plaintiff did not enjoy FMLA protection and thus "could not avail himself of the rights that flow from the FMLA, a necessary element of a retaliation claim"); *Russell v. Verizon Commc'ns, Inc.*, No. 01 Civ. 0752A, 2007 U.S. LEXIS 16779, at *18-19 (W.D.N.Y. Jan. 30, 2007) (report and recommendation) (granting summary judgment where plaintiff did not allege a serious health condition entitling him to take leave under the FMLA and accordingly could not establish a necessary element of a retaliation claim, the exercise of rights pursuant to FMLA), *adopted by* 2007 U.S. Dist. LEXIS 11721 (W.D.N.Y. Feb. 20, 2007).

"impairment of any system of the body," or "a mental or psychological impairment." *Id*. at (b)(1)-(2).  The law further provides that "any person claiming to be aggrieved by an unlawful discriminatory practice . . . shall have a cause of action in any court of competent jurisdiction." N.Y. Admin. Code § 8-502(a).

In addition to challenging the merits of Plaintiff's NYCHRL claim, Defendant persuasively argues that, under 28 U.S.C. § 1367(c), the Court should decline to exercise pendent jurisdiction over the claim, should Defendant be granted summary judgment on Plaintiff's FMLA claims.  (*See* Def. Mem., at 14.)  Under Section 1367(c), this Court may decline to exercise pendent jurisdiction over a state or local claim, where the Court has dismissed all claims over which it has original jurisdiction.

"[I]n the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York." *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001); *see also Ramirez v. New York City Bd. of Educ.*, 481 F. Supp. 2d 209, 223 (E.D.N.Y. 2007) (declining to exercise supplemental jurisdiction over plaintiff's state-law claims after dismissing FMLA claims).  For this reason, and as the Court has found that Defendant is entitled to summary judgment dismissing Plaintiff's federal claims under the FMLA, the Court declines to exercise pendent jurisdiction over Plaintiff's New York municipal law claims.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (Dkt. 17) is granted in its entirety.  Plaintiff's FMLA claims are dismissed with prejudice, and her NYCHRL claim is dismissed without prejudice to assertion of the claim in state court.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (Dkt. 17) is

granted in its entirety. Plaintiff's FMLA claims are dismissed with prejudice, and her NYCHRL

claim is dismissed without prejudice to assertion of the claim in state court.

Dated: New York, New York
September 30, 2009

SO ORDERED

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

David Abrams, Esq.
305 Broadway, 5th Floor
New York, NY 10007

Elissa Hunter, Esq.
201 West 85th Street
New York, NY 10024

28